DA 13-0191

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 41

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

DAVID JAY WALTON,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC 11-172
Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Joseph P. Howard, Attorney at Law, Great Falls, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Tammy K Plubell, Assistant
Attorney General, Helena, Montana

          William Fulbright, Ravalli County Attorney, Hamilton, Montana

Submitted on Briefs: January 22, 2014
Decided: February 18, 2014

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     David Jay Walton (Walton) appeals from the Judgment entered by the Twenty-First Judicial District Court on his conviction and sentence for the offense of sexual assault, a felony, in violation of § 45-5-502, MCA.  We affirm and address the following issues:

¶2     *1.  Did the prosecutor commit plain error by commenting on witness credibility during closing argument?*

¶3     *2.  Did the District Court err by denying Walton's motion for a new trial after the court sua sponte questioned a key defense witness?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4     J.L. is the biological mother of K.T., J.B., and A.B. J.L. and Walton became romantically involved in 2008, and lived together off-and-on again for several years.  During 2011, Walton resided with J.L. and her three children in Darby.  On the evening of December 15, 2011, K.T., eleven years old, watched television with her family and then went to bed.  K.T. testified that at some time during the night, she awoke to Walton "plopping down" on her bed and kissing her on the lips.  J.B., K.T.'s older half-brother, testified that he heard Walton enter K.T.'s room and say, "I'm sleeping in here" or "I'm sleeping with you."  K.T. explained that she eventually managed to fall back asleep, but was again awoken when Walton got out of her bed to use the restroom.  When he returned, Walton lay down next to K.T. and began to rub her leg.  He lifted K.T.'s shirt and touched her chest but not her breasts.  Walton then began to rub K.T.'s "lower area," which, she testified, felt "bad."  During the incident, Walton was "grunt[ing]" and the bed was shaking slightly.  He stopped and left the room when J.L. coughed and turned on the hallway light.

2

¶5     In the morning, Walton and J.L. left for work together.  Within ten minutes, K.T. disclosed the events of the previous night to J.B. and asked him what the difference was between being "raped and molested."  The two children did not discuss the incident further on their way to school, but later that morning, J.B. contacted the school counselor and informed him of K.T.'s disclosure.  Shortly thereafter, Deputy Jon Moles of the Darby Marshal's Office was dispatched to the Darby school to investigate K.T.'s sexual assault allegation.  Deputy Moles interviewed J.B. and then drove to Walton's place of employment to interview him as well.  K.T. was sent to the First STEP Resource Center at St. Patrick's Hospital in Missoula to undergo a forensic interview with Mary Pat Hansen (Hansen).

¶6     The State subsequently charged Walton with two counts of felony sexual assault in violation of § 45-5-502, MCA.  At trial, Walton relied on the defense theory that J.B. pressured K.T. into fabricating the sexual assault allegation in order to get him out of the family's home.  He testified that J.B. resented his authority and described their relationship as "incredibly difficult."  J.L., the children's mother, supported Walton's defense theory and testified on his behalf.  At the outset of her testimony, J.L. stated the first and last names of each of her three children.  Each of the children has a different father and, thus, a different last name.  After J.L. concluded, the District Court engaged her in the following line of questioning:

> THE COURT: Ma'am, I have a few questions for you. I'm trying to get the family figured out.  Your oldest child is [A.B.]?
>
> THE WITNESS: [A.B.]
>
> THE COURT: Who is her father?

3

THE WITNESS: [F.B.]

THE COURT: Who was that?

THE WITNESS: [F.B.], B. . . .

THE COURT: Okay. Where does he live?

THE WITNESS: Morenci, Arizona.

THE COURT: And then [J.B.'s] father is who?

THE WITNESS: He doesn't have one. He signed his rights over.

THE COURT: Well, who is his birth father?

THE WITNESS: [L.B.] He signed his rights over.

THE COURT: [L.B.]?

THE WITNESS: Yes.

THE COURT: And who is [K.T.'s] father?

THE WITNESS: [N.T.]

THE COURT: Now, [J.B.] said he was living with his brother. Is his brother your son?

THE WITNESS: No. It's my ex-husband's son.

THE COURT: So this would be his stepbrother?

THE WITNESS: His stepbrother, yes.

THE COURT: All right.

Following this exchange, the court provided both parties the opportunity to further question J.L., but they declined, and the witness was excused.

¶7 Hansen testified about her forensic interview with K.T. and the subsequent medical evaluation she performed. Hansen stated that her medical evaluation did not reveal any significant physical findings, but explained that her conversation with K.T. caused her to believe "that [K.T.'s] statements [were] consistent with a child who has experienced sexual abuse." As a result, Hansen recommended that K.T. undergo therapy.

¶8 During closing argument, the prosecutor referenced K.T.'s and Hansen's testimony to argue extensively that K.T. had experienced sexual abuse:

> The sexual assault that [K.T.] experienced, I think it's interesting how Ms. Hansen, Mary Pat Hansen, with all of her background, hundreds of kids she's interviewed, hundreds of kids she's worked with, and the way that she expresses her opinion, the way she expresses that expert opinion is that what [K.T.] disclosed to her was consistent with a child who has experienced sexual assault. Not consistent with some story of sexual assault, not consistent with a version of sexual assault; consistent with an experience of sexual assault . . . .
>
> . . .
>
> What is it you are seeing, this is someone who experienced something as opposed to someone who is simply trying to tell a story.
>
> . . .
>
> But she knew what happened because she had experienced it. He kissed me.
>
> . . .
>
> The sensations that she's able to describe are not made up. They are experienced.
>
> . . .
>
> And he said she's struggling with what all this means because she experienced it.
>
> . . .

Five months later she described the same experience. Here we are roughly five months after that, she sat in here and described the same experience. This is an 11-year old girl that the Defendant would have you believe is maintaining a complex, rather—for 11, a rather sophisticated experience that whole time.

. . .

[J.B.] tells what he experienced. Because the next thing he experiences is a few hours later when his sister comes to him and says, Hey, they are playing the Wii, getting ready for school, whatever, not asking her mom, not asking her sister, she asks her brother. Tell me what the difference is between rape and molesting because I think one of those happened to me.

. . .

But everything else came from [K.T.] because she experienced it. She talked about it.

The prosecutor continued during rebuttal closing:

They are asking an 11-year-old girl to maintain a complex, sophisticated, two levels—someone told her what to say, meaning [J.B.] told her what to say. She was able then to turn around and say it with enough sophistication, complexity, sensations, all the things that she would be expected to be able to say if she experienced it.

. . .

It doesn't make any sense. He just—[K.T.] was sexually assaulted.

¶9 The jury convicted Walton on one count of sexual assault and acquitted him of the other count. He moved for a new trial pursuant to § 46-16-702, MCA, but the District Court denied his motion. Walton was sentenced to a state prison designated by the Department of Corrections for a period of twenty years, with ten years suspended on conditions. Walton appeals.

6

## STANDARD OF REVIEW

¶10 "We generally 'do not address issues of prosecutorial misconduct pertaining to a prosecutor's statements not objected to at trial.'" *State v. Aker*, 2013 MT 253, ¶ 21, 371 Mont. 491, 310 P.3d 506 (quoting *State v. Longfellow*, 2008 MT 343, ¶ 24, 346 Mont. 286, 194 P.3d 694). However, we may review such an issue under the plain error doctrine. *Aker*, ¶ 21 (citation omitted). Plain-error review is appropriate only in those "'situations that implicate a defendant's fundamental constitutional rights when failing to review the alleged error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process.'" *State v. McDonald*, 2013 MT 97, ¶ 8, 369 Mont. 483, 299 P.3d 799 (citations omitted). Plain-error review is discretionary and is applied sparingly on a case-by-case basis. *McDonald*, ¶ 8 (citations omitted).

¶11 We review a district court's denial of a motion for a new trial for abuse of discretion. *State v. Ugalde*, 2013 MT 308, ¶ 26, 372 Mont. 234, 311 P.3d 772 (citations omitted).

## DISCUSSION

¶12 *1. Did the prosecutor commit plain error by commenting on witness credibility during closing argument?*

¶13 "Both the Sixth Amendment of the United States Constitution and Article II, Section 24 of the Montana constitution guarantee criminal defendants the right to a fair trial by a jury." *State v. Hayden*, 2008 MT 274, ¶ 27, 345 Mont. 252, 190 P.3d 1091. Prosecutorial misconduct "'may be grounds for reversing a conviction and granting a new trial if the conduct deprives the defendant of a fair and impartial trial.'" *McDonald*, ¶ 10 (quoting

*Hayden*, ¶ 27). However, this Court "'will not presume prejudice from the alleged misconduct, rather the defendant must show that the argument violated his substantial rights.'" *McDonald*, ¶ 10 (quoting *State v. Makarchuk*, 2009 MT 82, ¶ 24, 349 Mont. 507, 204 P.3d 1213). We evaluate a prosecutor's statements during closing argument in the context of the argument as a whole. *Ugalde*, ¶ 62 (citation omitted). "A prosecutor's argument is not plain error if made in the context of discussing the evidence presented and how it should be used to evaluate a witness's testimony under the principles set forth in the jury instructions." *Aker*, ¶ 27 (citation omitted).

¶14 Walton argues that the "prosecutor violated [his] right to a fair trial by repeatedly and improperly characterizing K.T. and J.B.'s testimony as truthful because they testified to what they, in his personal opinion, 'experienced' as opposed to repeating a 'story' or fabrication." He asserts "[t]he prosecutor used 'experience' and 'experienced' to convince the jury he possessed personal, omniscient knowledge Walton in fact sexually assaulted K.T." Walton argues this conduct invaded the province of the jury and violated the principle that a "'prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant,'" citing *ABA Standards for Criminal Justice: Prosecution Function and Defense Function*, Standard 3-5.8(b), 106 (3d ed., ABA 1993). Walton relies heavily on our decision in *Hayden* to support his conclusion that plain-error review is warranted in this case.

¶15 The State answers that the prosecutor "based his closing remarks upon the evidence and properly argued to the jury what it could infer from the evidence." The State cites cases in which this Court has declined to exercise plain-error review of a prosecutor's allegedly

8

improper comments: *Ugalde*, ¶ 62 (prosecutor purported to speak as a young victim); *Aker*, ¶¶ 25, 31 (prosecutor allegedly commented on witness credibility); *State v. Lacey*, 2012 MT 52, ¶¶ 18-19, 26, 364 Mont. 291, 272 P.3d 1288 (prosecutor discussed whether certain witnesses were candid and stated, "by God, he is [guilty]."); *State v. Arlington*, 265 Mont. 127, 157-58, 875 P.2d 307, 325 (1994) (prosecutor mentioned "a number of times, that [the defendant] had lied to the jury."); *State v. Lindberg*, 2008 MT 389, ¶¶ 33-35, 347 Mont. 76, 196 P.3d 1252 (prosecutor characterized a defense witness "as a 'liar' while arguing the State's evidence was genuine and truthful."); *State v. Rose*, 2009 MT 4, ¶¶ 105, 107, 348 Mont. 291, 202 P.3d 749, *superseded in part on other grounds*, *State v. Stops*, 2013 MT 131, 370 Mont. 226, 301 P.3d 811 (prosecutor argued the defendant had told "'the big lie'" to the jury because he believed they were gullible and naïve); and *State v. Rodgers*, 257 Mont. 413, 416, 419, 849 P.2d 1028, 1030, 1032 (1993) (prosecutor told the jurors that the defendant lied to their faces and described another witness's testimony as a deliberate lie).

¶16    In *Hayden*, the State charged Hayden with felony drug possession, misdemeanor possession of drug paraphernalia, and misdemeanor partner/family member assault after a search of Hayden's home substantiated Hayden's son's statements to police about Hayden's methamphetamine use and violent behavior. *Hayden*, ¶¶ 5-7. Hayden pled not guilty to all of the charges and proceeded to trial. *Hayden*, ¶ 8. During the State's case-in-chief, the prosecutor elicited opinion testimony from the investigating officer about the truthfulness of other witnesses. *Hayden*, ¶ 12. Then, during closing argument, the prosecutor told the jury that, in particular, two of the State's witnesses were "'believable'" and that the jury could "'rely on'" the investigating officer's testimony. The prosecutor also informed the jury that

9

the search of Hayden's home had been conducted properly, and that the officers do "'good work.'" Finally, the prosecutor stated that he was sure all of the items discovered during the search were related to drugs. *Hayden*, ¶ 14. On appeal, this Court determined to exercise plain-error review, finding that the prosecutor "impinged on the jury's role by offering his own opinion as to witnesses' testimony" and "improperly testified . . . by vouching for the efficacy of the search of Hayden's residence." *Hayden*, ¶¶ 32-33. Moreover, the prosecutor impermissibly questioned the investigating officer "on the credibility of other witnesses." *Hayden*, ¶ 31. Such conduct, we explained, "leaves unsettled the question of the fundamental fairness of the proceedings." *Hayden*, ¶ 33.

¶17 Unlike *Hayden*, we do not believe the prosecutor's statements in the instant case rise to the level of plain error under the governing standards of review. The prosecutor did not directly opine about the truthfulness of a witness, offer his own testimony, or elicit credibility testimony from other witnesses. We acknowledge that the prosecutor's comments could indicate a level of personal conviction and belief in the victim's testimony. However, as the State points out, "[i]mplicit in any prosecutor's closing argument is the prosecutor's belief that the State's witnesses are telling the truth—otherwise the prosecutor could not ethically be arguing a case to a jury." Furthermore, nothing in the record convinces us that "failing to review the alleged error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *McDonald*, ¶ 8. Therefore, we need not further address the merits of Walton's argument. This Court "will not set a precedent of presenting full analysis whenever a party asserts that an issue not properly preserved for appeal constitutes plain

10

error." *State v. Daniels*, 2003 MT 247, ¶ 28, 317 Mont. 331, 77 P.3d 224. Walton "waived [his] right to raise this claim on appeal by failing to object to the State's closing arguments during trial." *Ugalde*, ¶ 62.

¶18 *2. Did the District Court err by denying Walton's motion for a new trial after the court sua sponte questioned a key defense witness?*

¶19 Section 46-16-702(1), MCA, provides in pertinent part: "Following a verdict or finding of guilty, the court may grant the defendant a new trial if required in the interest of justice." It is essential to due process that a judge presides impartially in a criminal trial. *State v. Stafford*, 208 Mont. 324, 329, 678 P.2d 644, 647 (1984). "[I]n our adversarial system . . . the role of the trial judge is to regulate the proceedings and ensure that the trial is fair." *State v. Price*, 2006 MT 79, ¶ 21, 331 Mont. 502, 134 P.3d 45 (citation omitted). To this end, a judge must avoid "'officious interference'" in the proceedings. *Price*, ¶ 22 (quoting *State v. Richardson*, 69 Mont. 400, 403-04, 222 P. 418, 419 (1924)). However, a judge need not "remain silent and passive throughout a jury trial . . . ." *Price*, ¶ 22 (citation omitted). Montana Rule of Evidence 611(a) requires a district court to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth . . . ." Indeed "[t]he court may interrogate witnesses, whether called by itself or a party; provided, however, that in trials before a jury, the court's questioning must be cautiously guarded so as not to constitute express or implied comment." M. R. Evid. 614(b).

¶20 Following the jury's verdict, Walton moved for a new trial based on the District Court's decision to question J.L. regarding the identities of her children's fathers. The

District Court denied Walton's motion, concluding that "[a]fter review of the trial transcript excerpt and the Minute Entry of trial, . . . [the Court's] questioning at the close of [J.L.'s] testimony elicited no negative character evidence, should have caused [J.L.] no embarrassment, and did nothing to impeach [J.L.'s] credibility in the eyes of the jury." The District Court determined that all of the information elicited from J.L. during its questioning "was in evidence prior to the Court's questions," and that it had conducted the inquiry only because "the family ties as described by the child witnesses during the State's case [were] somewhat confusing."

¶21    Walton argues that the District Court's "improper inquiry" denied him a fair trial by placing J.L.'s prior sexual conduct at issue. He characterizes J.L.'s testimony as "crucial to [his] defense," and maintains that his conviction resulted from the jury rejecting J.L.'s "implicit[] if not explicit[]" testimony that her children lied in this case. According to Walton, the District Court's inquiry "had no relevance to any issue raised during the trial . . . [and] had the practical effect of conveying the impression J.L. was promiscuous—amounting to an attack on her credibility by using improper character evidence." Walton further argues that the prosecutor was able to capitalize on the District Court's "improper elicitation" by "cast[ing] further aspersions on [J.L.'s] character, credibility, and fitness as mother" during closing argument, as follows:

> I thought it's important for you to know how badly [J.L.] is willing to throw
> her son under the bus.

.  .  .

> But she's willing to come in here and chuck little—big [J.B.] underneath the
> bus . . . .

12

. . .

Why is she so willing to throw [J.B.] under the bus for this guy?

. . .

Why? Because she's willing to throw her kids under the bus for this guy.

During rebuttal closing the prosecutor stated:

Oh, and there's proof because there's no counseling for [K.T.] because mother
of the year decided she doesn't need counseling. I'll leave that alone.

¶22 The State responds that the District Court "did nothing more than ask some brief clarifying questions about matters already in the record to clear up its confusion about familial relationships." Such an inquiry, the State argues, did not call J.L.'s credibility into question and did not serve to deny Walton a fair trial.

¶23 Although the District Court should have been more circumspect about the potential of bringing improper attention to J.L.'s background, all of the information elicited by the court during its inquiry had already been presented to the jury through appropriate questioning by counsel. We cannot conclude that the court's brief summation "constitute[d] express or implied comment," M. R. Evid. 614(b), about J.L.'s character or credibility. By clarifying which of J.L.'s children belonged to which father, the court did not call into question J.L.'s morality or impugn the truthfulness of her testimony. Moreover, we fail to see the connection between the District Court's inquiry and the prosecutor's closing remarks that Walton seeks to draw. Certainly, prosecutors should avoid using derogatory language and epithets at trial. *State v. White*, 151 Mont. 151, 161, 440 P.2d 269, 275 (1968). However, the District Court did not "open[] the door" to the prosecutor's comments, and any perceived

13

basis for objection to those comments could have been raised and addressed during the trial. We conclude the District Court did not abuse its discretion when it determined that a new trial was not warranted in the interest of justice.

¶24     Affirmed.

/S/ JIM RICE

We Concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ MICHAEL E WHEAT
/S/ BETH BAKER