FILED

01/26/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 18-0006

DA 18-0006

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 12

STATE OF MONTANA,

       Plaintiff and Appellee,

   v.

TREVOR JOSEPH MERCIER,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Nineteenth Judicial District,
In and For the County of Lincoln, Cause No. DC 16-110
Honorable Matthew J. Cuffe, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Koan Mercer (argued), Assistant
          Appellate Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Michael P. Dougherty
          (argued), Assistant Attorney General, Rob Cameron, Deputy Attorney
          General, Helena, Montana

          Marcia Jean Boris, Lincoln County Attorney, Libby, Montana

Argued and Submitted:  October 14, 2020

Decided:  January 26, 2021

Filed:

_____
                  Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Trevor Joseph Mercier appeals his convictions after jury trial in the Nineteenth Judicial District Court, Lincoln County, of Deliberate Homicide and Tampering with Physical Evidence. We affirm in part and reverse in part, stating the issues as follows:

1. *Was Mercier denied his right under the United States and Montana Constitutions to confront witnesses against him when the State presented a foundational witness in real time by two-way videoconference?*

2. *If so, did the State meet its burden to demonstrate the error was harmless as to the Deliberate Homicide conviction and the Tampering with Physical Evidence conviction?*

3. *Did the prosecutor commit plain error during the closing argument?*

We conclude Mercier's right of confrontation was violated, requiring reversal of his conviction of Tampering with Physical Evidence. We affirm his Deliberate Homicide conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Mercier and Sheena Devine were in a relationship that ended in early 2016. On the evening of October 5, 2016, an intoxicated Mercier went to Sheena's residence and began to pelt her vehicle with rocks. At 9:42 p.m., neighbors placed a 911 call to report the vandalism. A sheriff's deputy was dispatched to the scene, but Mercier had fled prior to his arrival. The deputy spoke with Sheena and advised her to report any further disturbances to authorities.

¶3 Sometime between 10 p.m. and 11 p.m., Mercier returned to Sheena's residence and again threw rocks at her vehicle. Instead of contacting police, Sheena went outside and

2

confronted Mercier. According to Mercier, Sheena physically attacked him, striking and scratching his face and head. Mercier contended he placed Sheena in a "sleeper hold" to thwart her attack, resulting in Sheena losing consciousness. According to Mercier, he carried Sheena into her living room and laid her down, and, after checking that she was still breathing, left within five to ten minutes. Mercier stated Sheena was breathing and snoring when he left.

¶4 At approximately 10 o'clock the next morning, October 6, Lincoln County Sheriff's dispatch received a call requesting medical assistance for a possible assault. The call was placed by Sheena's friend and neighbor who had stopped by Sheena's residence. An emergency medical technician arrived first and determined that Sheena had died. The EMT immediately contacted dispatch requesting expedited law enforcement support, and Officer Scott Kessel quickly proceeded to the scene. Kessel found the EMT, the friend who had placed the 911 call, and Sheena's two young daughters, along with her body, which was lying on the floor between a couch and rocking chair. Sheena's two-year-old daughter was sitting atop her discolored body, and her four-year-old daughter paced aimlessly. Sheena had sustained physical injuries, with heavy bruising above her right eye and large abrasions to her chin and right cheek. Police discovered Sheena's cellphone submerged in a pot of greasy water in the kitchen sink.[1]

---

[1] During the investigation, police found a petition for an order of protection on Sheena's kitchen table. Mercier was previously arrested for assaulting Sheena in February 2016. Sheena had previously obtained an order of protection against Mercier, but it was not in effect at the time of this incident.

¶5     Mercier was taken into custody and interviewed, after which he was charged with three criminal offenses: Criminal Mischief for damaging Sheena's car by throwing rocks, Deliberate Homicide, and Tampering with Physical Evidence related to Sheena's submerged phone. Mercier pled guilty to Criminal Mischief, but not guilty to the other two counts. Mercier would defend by claiming Sheena's death was accidental and that he had not handled her phone.

¶6     Investigators removed Sheena's phone from the greasy water and found, somewhat remarkably, that it remained operational. However, local technicians struggled to retrieve information from the device, and it was delivered to Special Agent Brent Johnsrud of the Department of Homeland Security, Greeley, Colorado, who specialized in extracting data from electronics. Johnsrud was able to extract and analyze the phone's data, and prepared a written report of his findings.

¶7     Prior to trial, the State moved for leave to call Johnsrud to testify from Colorado by live two-way video. As grounds, the State offered that the $670 for roundtrip air travel and other travel expenses for purely foundational testimony was impractical. Mercier's objection was overruled by the District Court, and Johnsrud testified via two-way videoconferencing. Johnsrud's testimony addressed the methods and equipment employed to retrieve the data from the cellphone, among other foundational purposes. He testified that in order to extract data from mobile devices, a forensic examiner must "at least be able to power on the device," and that "the raw data extraction" he had completed and provided to Agent Kevin McCarvel of the Montana Department of Justice was "an exact copy of

4

what was contained on the device." Then, Agent McCarvel testified regarding Johnsrud's report of the phone's contents, particularly, two time-stamped photographs retrieved from the phone.

¶8     Mercier asked the jury, consistent with his version of incident, to find him guilty of Negligent Homicide rather than Deliberate Homicide. To counter this position, the State presented a neighbor who testified to seeing Mercier inside Sheena's residence around midnight. Although the medical examiner was unable to determine a specific time of death, this evidence indicated that Mercier was still in the house one hour after the physical altercation, contrary to Mercier's account. The State also offered two photographs from Sheena's phone, one of which was solid black, and the other a blurry image of Sheena's kitchen. The photographs were timestamped at 12:00:20 a.m. and 12:00:21 a.m. The angle at which the kitchen photograph was taken made it improbable that it was taken by Sheena's daughters. The photographs were the only evidence offered that Mercier had handled the phone that evening.

¶9     During closing argument, defense counsel, in an apparent attempt to reconcile errors and omissions in Mercier's recollection of events, repeatedly compared Mercier's "mistake" in his initial account to law enforcement to "forgetting the eggs" during a trip to the grocery store. Possibly confused by the analogy, but in light of Mercier's position that he should be found guilty of only Negligent Homicide, prosecutors inferred from this argument that the "mistake" alluded to by defense counsel was the "mistake" of killing Sheena. Defense counsel also employed another grocery parallelism, comparing Mercier's

5

lifting of Sheena's unconscious body to "wrap[ping] your arm around essentially what is going to be a very large amount, something similar to almost three bags of potatoes, if not more." In response, the prosecutor stated in rebuttal that "Sheena Devine's life was worth more than eggs on a grocery list and three bags of potatoes. And you should be appalled that the value of her life apparently escapes [defense counsel], just as the value of her life to her children and her family was disregarded by Trevor Mercier on the night of October fifth." Mercier did not object to these comments.

¶10 Mercier was convicted of the Deliberate Homicide and Tampering with Physical Evidence charges, and appeals.

**STANDARD OF REVIEW**

¶11 This Court exercises plenary review of constitutional questions and applies de novo review to a district court's constitutional interpretations of the Sixth Amendment of the United States Constitution and Article II, Section 24 of the Montana Constitution. *State v. Stock*, 2011 MT 131, ¶ 16, 361 Mont. 1, 256 P.3d 899 (citing *State v. Norquay*, 2011 MT 34, ¶ 13, 359 Mont. 257, 248 P.3d 817).

¶12 All other legal conclusions of law are evaluated for correctness subject to de novo review. *City of Missoula v. Duane*, 2015 MT 232, ¶ 10, 380 Mont. 290, 355 P.3d 729. Evidentiary rulings are reviewed for an abuse of discretion. *Duane*, ¶ 10. Abuse of discretion occurs if the district court acted arbitrarily and without the employment of conscientious judgment or in a manner that exceeds the bounds of reason, resulting in

6

substantial injustice. *Stock*, ¶ 17 (citing *State v. Mackrill*, 2008 MT 297, ¶ 37, 345 Mont. 469, 191 P.3d 451).

¶13 We generally do not address "'prosecutorial misconduct pertaining to a prosecutor's statements not objected to at trial.'" *State v. Aker*, 2013 MT 253, ¶ 21, 371 Mont. 491, 310 P.3d 506 (quoting *State v. Longfellow*, 2008 MT 343, ¶ 24, 346 Mont. 286, 194 P.3d 694). However, we may review such issues under the plain error doctrine. *State v. Lehrkamp*, 2017 MT 203, ¶ 11, 388 Mont. 295, 400 P.3d 697 (citing *State v. Walton*, 2014 MT 41, ¶ 10, 374 Mont. 38, 318 P.3d 1024).

## DISCUSSION

¶14 *1. Was Mercier denied his right under the United States and Montana Constitutions to confront witnesses against him when the State presented a foundational witness in real time by two-way videoconference?*

¶15 The Confrontation Clause of the Sixth Amendment of the United States Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Montana Constitution provides that "[i]n all criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face[.]" Mont. Const. art. II, § 24.

¶16 In its earliest case interpreting the Clause, the Supreme Court explained:

> The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

7

*Mattox v. United States*, 156 U.S. 237, 242-43, 15 S. Ct. 337, 339 (1895). The Supreme Court has since summarized the purpose of the Confrontation Clause as "ensur[ing] reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding," a purpose that is fulfilled by "'guarantee[ing] the defendant a face-to-face meeting with witnesses appearing before the trier of fact.'" *Maryland v. Craig*, 497 U.S. 836, 844, 110 S. Ct. 3157, 3162-63 (1990) (quoting *Coy v. Iowa*, 487 U.S. 1012, 1016, 108 S. Ct. 2798, 2801 (1988)); *see also Coy*, 487 U.S. at 1019, 108 S. Ct. at 2801 ("It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' . . . [E]ven if a lie is told, it will often be told less convincingly."); *California v. Green*, 399 U.S. 149, 158, 90 S. Ct. 1930, 1935 (1970) (referring to cross-examination as "the greatest legal engine ever invented for the discovery of truth" (citation omitted)). These elements of confrontation serve the purposes of the Confrontation Clause "by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Craig*, 497 U.S. at 846, 110 S. Ct. at 3163 (citing *Kentucky v. Stincer*, 482 U.S. 730, 739, 107 S. Ct. 2658, 2664 (1987)).

¶17 Within these constitutional principles, the Supreme Court has also recognized that physical face-to-face confrontation "is not the *sine qua non* of the confrontation right," and has carved out certain exceptions. *Craig*, 497 U.S. at 847, 110 S. Ct. at 3164 (citing *Delaware v. Fensterer*, 474 U.S. 15, 22, 106 S. Ct. 292, 295-96 (1985) (*per curiam*)); *Craig*, 497 U.S. at 850, 110 S. Ct. at 3166 ("[I]t is all but universally assumed that there

8

are circumstances that excuse compliance with the right of confrontation.") (quoting Kenneth W. Graham, Jr., *The Right of Confrontation and the Hearsay Rule: Sir Walter Raleigh Loses Another One*, 8 Crim. L. Bull. 99, 107-108 (1972)); *see Stock*, ¶ 28 ("[W]e have never interpreted greater protection to entitle a criminal defendant to *literal* face-to-face confrontation with all witnesses." (original emphasis)). In *Craig*, the Supreme Court affirmed a Maryland court that, pursuant to a state statute, permitted a child to testify in a separate room by one-way video stream during the criminal trial of a woman charged with sexually assaulting the child. *Craig*, 497 U.S. at 841, 110 S. Ct. at 3161. The child-witness, prosecutor, and defense attorney all went into a separate room where the examination took place, while the judge, jury, and defendant observed the video from the courtroom. *Craig*, 497 U.S. at 841, 110 S. Ct. at 3161. Prior to the testimony, the prosecution presented expert testimony opining that requiring the child to testify in front of the accused would cause anxiety and agitation, and obstruct the child from properly communicating. *Craig*, 497 U.S. at 842, 110 S. Ct. at 3161-62. In affirming, the Supreme Court explained "that the face-to-face confrontation requirement is not absolute does not, of course, mean that it may be easily dispensed with[,]" and that a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial "only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Craig*, 497 U.S. at 850, 110 S. Ct. at 3166.

9

¶18    *Craig* has subsequently been characterized as adopting a two-prong analysis. *See,*
*e.g., United States v. Carter*, 907 F.3d 1199, 1207 (9th Cir. 2018); *United States v. Yates*,
438 F.3d 1307, 1313 (11th Cir. 2006) ("[T]he Supreme Court crafted its two-part standard
to constrain the use of one-way closed-circuit television[.]" (internal quotation and citation
omitted)); *State v. Rogerson*, 855 N.W.2d 495, 502-503 (Iowa 2014) (noting it was joining
large majority of jurisdictions surveyed in requiring the "*Craig* standard" of necessity and
reliability).  Thus, it must first be shown that denial of physical face-to-face confrontation
is necessary to further an important public policy.  *Carter*, 907 F.3d at 1205-1206;
*Rogerson*, 855 N.W.2d at 499.  The second prong of the *Craig* analysis requires the trial
court to determine that reliability of the testimony is otherwise assured.  *Carter*, 907 F.3d
at 1206; *Rogerson*, 855 N.W.2d at 499.

¶19    Courts are essentially uniform in requiring, under the first prong, "something more
than [] generalized findings" of policy concerns.  *Coy*, 487 U.S. at 1021, 108 S. Ct. at 2803.
"[A] defendant's right to 'physical, face-to-face confrontation at trial' may be
compromised by the use of a remote video procedure only upon a 'case-specific finding'
that [] the denial of physical confrontation 'is necessary to further an important public
policy[.]'"  *Carter*, 907 F.3d at 1208 (quoting *Craig*, 497 U.S. at 858, 110 S. Ct. 3170);
*see also Green*, 399 U.S. at 189 n.22, 90 S. Ct. at 1951 (Harlan, J., concurring) (noting a
criminal defendant's constitutional rights cannot be neglected merely to avoid "added
expense or inconvenience"); *Carter*, 907 F.3d at 1208 (holding judicial economy and
"added expense or inconvenience" is insufficient to extend *Craig*); *People v. Jemison*,

10

505 Mich. 352, 364 (2020) (holding that saving costs is insufficient justification to extend *Craig*).

¶20    The parties and the District Court appear to interpret *Duane* as lowering the required showing under the first prong of the *Craig* analysis because of our statement that video could be employed when physical presence of a witness was "impossible or impracticable," rather than "necessary." *Duane*, ¶ 25.[2]   However, this comparison is a bit of mixing analytical apples and oranges.  Our conclusion paragraph in *Duane* simply stated it must be shown "the personal presence of the *witness* is impossible or impracticable," *Duane*, ¶ 25 (emphasis added), which left unaltered *Craig*'s second prong permitting denial of physical confrontation when "necessary to further an important public *policy*." *Craig*, 497 U.S. at 850, 110 S. Ct. at 3166 (emphasis added).  The apparent alarm over our use of the word "impracticable" is dispelled by consideration of the facts in *Duane*.  There, three co-defendants charged with animal cruelty elected to have separate trials. *Duane*, ¶ 5.  The veterinarian who had performed the autopsy on the deceased animal had moved to California between the time of her examination and the trial dates. *Duane*, ¶ 6. Bringing the veterinarian to Montana for three separate trials, which was described as "an extraordinary expense on the City and a significant burden on [the veterinarian]," *Duane*, ¶ 6, rendered it a substantial financial and logistical impracticality, if not a literal impossibility, for the City of Missoula to proceed with the misdemeanor charges unless the

---

[2] Indeed, Mercier asks that we overrule *Duane*.

11

veterinarian appeared by two-way videoconferencing technology. *Duane*, ¶ 21. The substantial impracticality of the out-of-state witness's physical appearance in three misdemeanor trials satisfied the requirement of *Craig* that use of video was necessary to further an important public policy. *Duane*, ¶ 21.

¶21 To satisfy *Craig*'s second prong, reliability, the hallmarks of confrontation must be present—the non-physically present witness must be under oath and understand the seriousness of his or her testimony, be subject to cross-examination, and permit assessment of the witness's veracity by the factfinder. *Duane*, ¶ 15 (citing *Stock*, ¶ 23); *Craig*, 497 U.S. at 857, 110 S. Ct. at 3170; *Carter*, 907 F.3d at 1206 (noting that the elements of confrontation—oath and competency, cross-examination, and viewable by judge and jury—were present in satisfaction of the second prong). *Craig*'s second prong is not the primary focus of this appeal.[3]

¶22 We pause to note that *Craig*'s continuing utility has been questioned in two major respects; first, whether its analysis extends to *two-way* video procedures has led to a circuit split in the federal courts. *Compare United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999) (holding *Craig* did not apply to two-way video systems and instead applying a standard from Federal Rules of Criminal Procedure Rule 15), *with Carter*, 907 F.3d at 1208 n.4 ("We agree with the Eighth and Eleventh Circuits that [the Second Circuit] is an outlier and that the proper test is *Craig*" for determining if two-way video procedures satisfy the

---

[3] Mercier states he "does not concede" the reliability prong but did not provide an argument on that question.

right to face-to-face confrontation); *see also Yates*, 438 F.3d at 1313-15 (en banc) (extending *Craig*'s analysis to two-way video), *and United States v. Bordeaux*, 400 F.3d 548, 554-55 (8th Cir. 2005) (same); *cf. United States v. Weekley*, 130 F.3d 747, 753 (6th Cir. 1997) (applying *Craig*'s standard without analyzing one-way versus two-way); *United States v. Farley*, 992 F.2d 1122, 1124-25 (10th Cir. 1993) (same). Similarly, state courts have struggled in determining whether *Craig* extends to two-way video procedures. *Compare Rogerson*, 855 N.W.2d at 502-503 (applying *Craig* to two-way video systems while noting that state courts in Florida, Texas, Wyoming, North Carolina, Virginia, New York, Montana, and Pennsylvania had done the same); *and State v. Thomas*, 376 P.3d 184, 193-94 (N.M. 2016) (applying *Craig*'s two-prong test without analysis of one-way versus two-way video procedures), *with Jemison*, 505 Mich. at 365 (confining the *Craig* test to its specific facts—one-way video with a child sexual abuse victim). Despite the disagreement among courts, our research leads to the conclusion that the overwhelming majority of jurisdictions have applied *Craig* to two-way video procedures, a position that we continue to adhere to. *See e.g.*, *Duane*, ¶ 21 (applying *Craig* to two-way video testimony without analysis of one-way versus two-way video); *Stock*, ¶ 30 (same).

¶23    The second challenge to *Craig*'s utility is whether it has been abrogated by the Supreme Court's landmark Confrontation Clause decision in *Crawford*. *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004). There, Crawford was put on trial for the stabbing death of a man who had allegedly attempted to rape Crawford's wife. *Crawford*, 541 U.S. at 38, 124 S. Ct. at 1357. Crawford's wife gave a tape-recorded description of

13

the stabbing, but did not testify at trial pursuant to Washington's marital privilege rule. *Crawford*, 541 U.S. at 39-40, 124 S. Ct. at 1357. Crawford objected to the admission of the recording, but it was admitted under a hearsay exception. *Crawford*, 541 U.S. at 40, 124 S. Ct. at 1358. Following a comprehensive review of the historical right to confrontation, the Supreme Court determined the wife's statement during interrogation was testimonial in nature, rather than non-testimonial, and, therefore, the husband's right to confrontation required the right to cross-examine his wife about the recording. *Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374. The Court explained that the Confrontation Clause was a "procedural [right to test the reliability of the testimonial statement with cross-examination] rather than a substantive guarantee" of reliability, and therefore out-of-court testimonial statements were inadmissible regardless of indicia of reliability. *Crawford*, 541 U.S. at 61, 124 S. Ct. at 1370.

¶24    In a recent decision, the Michigan Supreme Court confined *Craig* to its specific facts—one-way video, child victim. *Jemison*, 505 Mich. at 365. That court faced an issue factually similar to the one here: over defense objection, an out-of-state expert was permitted to testify via live two-way video as a cost-saving measure. *Jemison*, 505 Mich. at 357-58. The court did not analyze the necessity prong in depth, noting only that "expense is not a justification for a constitutional shortcut." *Jemison*, 505 Mich. at 364. Rather, the opinion focused on the reliability of testimony adverse to the defense procured by two-way video. The Michigan Supreme Court reasoned that, since *Crawford* had overruled *Roberts*—the case that established the "reliability framework" that was the cornerstone of

14

*Craig*'s second prong—and *Craig* had been decided under the "reliability framework" of *Roberts*, *Craig* was implicitly superseded by *Crawford* on all confrontation issues not factually identical to *Craig*. *Jemison*, 505 Mich. at 355-56; *see also Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531 (1980).

¶25　　While "*Crawford* may call into question the prior holding in *Craig* to the extent that *Craig* relied on the reliability of the video testimony[,]" reliability of the two-way video is not independently challenged here, and the only *Craig* issue to be resolved is whether the necessity prong has been satisfied. *Thomas*, 376 P.3d at 193.[4]　However, assuming arguendo that reliability was at issue, we are not prepared to declare the proverbial death knell to *Craig* just yet, and prefer to await further direction from the Supreme Court. As one commentator has noted, it may be that the two cases may coexist, with *Crawford* setting the standard for the type of out-of-court statements that are subject to the confrontation right and *Craig* governing the manner in which in-court testimony may be presented. M.C. McAllister, *The Disguised Witness and* Crawford*'s Uneasy Tension with* Craig*: Bringing Uniformity to the Supreme Court's Confrontation Jurisprudence*, 58 Drake L. Rev. 481, 512-13 (2010). Indeed, *Crawford* did not even address *Craig*, let alone overrule it, nor was the face-to-face aspect of confrontation specifically at issue in *Crawford*. *Stock*, ¶ 25; *Thomas*, 376 P.3d at 193 (providing survey of other jurisdictions maintaining applicability of *Craig* as good law).

---

[4] Mercier does not argue that *Craig* should not be applied.

¶26 Turning back to the case at bar, we consider whether use of two-way video for Special Agent Johnsrud's testimony was "necessary to further an important public policy" under *Craig*'s first prong. The State emphasizes that, as articulated by the Supreme Court in *Craig*, "the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial, a preference that *must occasionally give way to considerations of public policy and the necessities of the case*." *Craig*, 497 U.S. at 849 (citation and quotations omitted) (emphasis added). The State thus argues the use of the two-way video was permissible because, pursuant to the public policy of judicial economy, it was unreasonable to incur significant travel expenses and inconveniences for testimony deemed to be purely foundational. The District Court agreed, ruling under *Duane* that the "significant time and expense" required for Johnsrud to testify in-person outweighed any perceived diminution of Mercier's confrontation right and the cross-examination's efficacy. However, as noted by the Ninth Circuit Court of Appeals, quoting Justice Harlan, merely "avoiding added expense or inconvenience" is not sufficient, without more, to dispense with the preference for face-to-face testimony. *Green*, 399 U.S. at 189 n.22, 90 S. Ct. at 1951 (Harlan, J., concurring); *Carter*, 907 F.3d at 1208. Even if it were, "case-specific" findings demonstrating the necessity of video testimony were not entered here. We can draw only the conclusion from the record that video testimony was permitted for the stake of generalized judicial economy, with the District Court noting "it is commonplace in this court for expert witnesses[,] such as medical experts and crime and technicians, to testify in criminal cases" by two-way videoconferencing technology, and the State adding that

16

"many Montana attorneys would have readily" stipulated to the foundation or permitted the video testimony. These statements may be correct, but one defendant's waiver of constitutional right does not establish a precedent for waiver of the right by subsequent defendants, and neither does the practice of other attorneys. Although judicial economy may be an important public policy in other contexts, standing alone, it must yield to the constitutional rights of the accused.

¶27 The State urges that the nature of the testimony—foundational with no substantive force—weighs in favor of approving the video testimony. However, nowhere in the text of the Confrontation Clause is there language limiting the type of testimonial evidence to which the right to physical confrontation applies. *See* U.S. Const. amend. VI; Mont. Const. art. II, § 24; *State v. Clark*, 1998 MT 221, ¶ 22, 290 Mont. 479, 964 P.2d 766 (reversible error to allow a forensic report to be admitted by the written deposition of a technician absent the physical presence of the technician because neither the nature of the witness nor the evidence which may be entered based upon the witness's testimony impacts the right to confront the witness).

¶28 We conclude that furtherance of an important public policy to allow Special Agent Johnsrud to testify via two-way videoconferencing was not here demonstrated, and the first prong of the *Craig* analysis was not satisfied, in error. Johnsrud's video testimony was improperly admitted. Its necessary exclusion means there was no foundation for admission of the two midnight photographs extracted from Sheena's cell phone, which must be excluded as well.

¶29 *2. Did the State meet its burden to demonstrate the error was harmless as to the Deliberate Homicide conviction and the Tampering with Physical Evidence conviction?*

¶30 When reviewing errors, we first determine if the error was a "structural" or "trial" error. *State v. Van Kirk*, 2001 MT 184, ¶ 41, 306 Mont. 215, 32 P.3d 735. "Structural" errors are those that "'affect[] the framework within which the trial proceeds, rather than simply an error in the trial process itself.'" *Van Kirk*, ¶ 38 (quoting *Arizona v. Fulminante* (1991), 499 U.S. 279, 310, 111 S. Ct. 1246, 1265). Structural errors are reversible and require no additional analysis for prejudice. *Van Kirk*, ¶ 39. Conversely, trial errors, which typically occur during the presentation of the case to the jury, are "amenable to qualitative assessment by a reviewing court for prejudicial impact relative to the other evidence introduced at trial" and are subject to harmless error review. *Van Kirk*, ¶ 40 (citing Montana's harmless error statute, § 46-20-701(1), MCA).

¶31 A constitutional deprivation of the defendant's confrontation right is a trial error and is subject to harmless error review. *Carter*, 907 F.3d at 1210. Pursuant thereto, the State, as the "beneficiary of a constitutional error[,]" bears the burden of proving that the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967). The "assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation[,]" and instead harmlessness must "be determined on the basis of the remaining evidence." *Coy*, 487 U.S. at 1021-22, 108 S. Ct. at 2803. We consider "the importance of the witness' testimony in the prosecution's case, whether the

18

testimony was cumulative, [and] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points[.]" *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438 (1986). However, "overwhelming evidence" absent the tainted evidence in favor of guilt will not alone suffice to uphold a conviction. *Van Kirk*, ¶ 43 (overruling prior decisions that analyzed whether there was "overwhelming evidence" to support the conviction because such a test is a subjective inquiry that weighs the relative volume of the evidence presented). Rather, we employ the more restrictive "cumulative evidence" test, which "looks not to the quantitative effect of other admissible evidence, but rather to whether the fact-finder was presented with admissible evidence that proved *the same facts as the tainted evidence proved*." *Van Kirk*, ¶ 43 (original emphasis).

¶32     Here, the evidence to be analyzed is the two photographs extracted from Sheena's cell phone, one of the kitchen area of Sheena's home and both time-stamped around midnight on the night of the incident. Despite exclusion of the photographs, which gave rise to an inference that Mercier was in Sheena's home at midnight, the State's presented case remained viable on the basis of other admitted evidence sufficient to prove the same point, and which supported a finding of guilt. Indeed, this evidence was potentially even stronger than the excluded photographs. The State presented an eyewitness who testified to observing Mercier inside Sheena's residence around midnight—the same time the photographs were taken in the house and time-stamped—closing the shades of Sheena's kitchen window. Thus, the photographs were cumulative on the timing point with the testimonial evidence provided by the eyewitness. Mercier contends the eyewitness'

19

account was impeached and therefore did not constitute cumulative evidence on the point. However, Mercier's argument is an interpretational second-guessing of the evidence. It is not his role or ours when assessing harmless error to make credibility judgments about the overlapping evidence, but rather to assess whether sufficient cumulative evidence was presented to prove the same point, and here there was. An attempt to determine how jury perception or the eyewitness testimony would have been altered absent the confrontation issue would "involve pure speculation[.]" *Coy*, 487 U.S. at 1022, 108 S. Ct. at 2803. Moreover, the excluded photographs themselves did not identify Mercier as taking the photographs; conversely, and more compellingly, the witness' testimony affirmatively placed Mercier inside the home around midnight. Consequently, because evidence other than the tainted photographs was presented demonstrating Mercier's presence in the home at midnight, in contradiction to his version of the incident, the State has carried its burden of showing that the Confrontation Clause violation was harmless beyond a reasonable doubt as to the Deliberate Homicide conviction. That conviction is affirmed.

¶33 However, we reach the opposite conclusion regarding the Tampering conviction. The State offered no other physical or testimonial evidence tending to prove that Mercier handled Sheena's phone or otherwise tampered with it during the time in question. The only evidence connecting Mercier to use of the phone was the two photographs time-stamped at midnight, combined with the angle of the photograph taken of the kitchen, which gave rise to an inference that Mercier, and not a child, had taken the photograph. Because the only evidence offered by the State supporting Mercier's handling of the phone

20

is tainted by the Confrontation Clause violation, the State has not carried its burden to prove the error was harmless beyond a reasonable doubt, and his conviction for Tampering with Physical Evidence must be set aside.

¶34   *3. Did the prosecutor commit plain error during the closing argument?*

¶35   The purpose of plain error review is to correct an otherwise objectionable error not objected to at trial that impacts the "fairness, integrity, and public reputation of judicial proceedings." *State v. Lawrence*, 2016 MT 346, ¶ 9, 386 Mont. 86, 385 P.3d 968 (internal citation and quotation omitted). We invoke plain error review sparingly, on a case-by-case basis, and only "in situations that implicate a defendant's fundamental constitutional rights when failing to review the alleged error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *Aker*, ¶ 21 (citing *State v. McDonald*, 2013 MT 97, ¶ 8, 369 Mont. 483, 299 P.3d 799).

¶36   Mercier contends the State's comments on defense counsel's asserted undervaluing of Sheena's life was a "wholly improper ad hominem attack on defense counsel" and "create[d] a prejudicial link between defense counsel's alleged immorality and [Mercier's] guilt." Mercier argues the comments are an appropriate basis for a new trial. The State responds that, despite Mercier's current characterization of the statement, a review of the entirety of defense counsel's summation indicates the prosecution could have reasonably understood defense counsel "to be analogizing Mercier's 'mistake' in killing Sheena to the mistake of leaving eggs off a shopping list[,]" especially in light of Mercier's request to be

21

convicted of Negligent Homicide. The State argues that, in any event, the prosecutor's response was "unmistakably a comment 'on the gravity of the crime charged[.]'"

¶37 We consider claimed improper statements by the State during closing arguments "in the context of the entire argument." *State v. Makarchuk*, 2009 MT 82, ¶ 24, 349 Mont. 507, 204 P.3d 1213 (citing *State v. Roubideaux*, 2005 MT 324, ¶ 15, 329 Mont. 521, 125 P.3d 1114). Prosecutorial misconduct calls for reversible error if it prejudices a defendant's substantial rights. *Lehrkamp*, ¶ 15 (citation omitted). Such prejudice is not inferred and the "'defendant must demonstrate, from the record, that the prosecutor's misstatements prejudiced him.'" *Lehrkamp*, ¶ 15 (quoting *State v. Dobrowski*, 2016 MT 261, ¶ 28, 385 Mont. 179, 382 P.3d 490). Prosecutors must refrain from offering personal opinions, but may appropriately comment on "'the gravity of the crime charged, the volume of evidence, credibility of witnesses, inferences to be drawn from various phases of evidence, and legal principles involved[.]'" *McDonald*, ¶ 14 (quoting *State v. Green*, 2009 MT 114, ¶ 33, 350 Mont. 141, 205 P.3d 798).

¶38 A prosecutor who comments on *defense counsel*'s disregard for the value of human life—as opposed to a *defendant*'s potential disregard for life as evidenced by his actions—is certainly on thin ice. However, at a minimum, defense counsel's grocery analogies, especially in view of Mercier's trial position that he was guilty of negligently killing Sheena, were awkwardly framed, conveying an intent that was not entirely clear. Whether or not they were correctly understood by the prosecutor, we conclude on the basis of the record as a whole that review of this potential error is not necessary to prevent a "manifest

miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *Aker*, ¶ 21. We conclude that Mercier's right to a fair trial was not undermined by the prosecutor's closing argument, and we affirm the Deliberate Homicide conviction.

## CONCLUSION

¶39　For the reasons discussed herein, we conclude the District Court erred by allowing Special Agent Johnsrud to testify, over Mercier's objection, via two-way video. We affirm Mercier's conviction for Deliberate Homicide because the error was harmless, and the prosecution's closing statements did not warrant plain error review. We reverse Mercier's conviction for Tampering with Physical Evidence because the State did not demonstrate the Confrontation Clause error was harmless.

¶40　Affirmed in part, reversed in part, and remanded for entry of an amended judgment.


/S/ JIM RICE


We concur:

/S/ BETH BAKER


Justice Ingrid Gustafson, specially concurring and dissenting.

¶41　I concur with the plurality Opinion (Opinion) that application of the analysis in *Craig* is appropriate to determine whether the District Court properly abrogated Mercier's right to face-to-face confrontation of the witness. I also agree the two-way video

23

conferencing in this case was not demonstrated to further an important public policy such that denial of in-person, face-to-face confrontation was not "necessary" under the first prong of *Craig*. I agree with the Opinion that this error was harmless as to Mercier's Deliberate Homicide conviction and concur in affirming that conviction, but such error was not harmless in regard to his conviction for Tampering with Physical Evidence such that I concur in reversing his conviction on that charge. I further concur with the Opinion as to issue 3. I write as I believe the Opinion leaves confusion as to how *Duane* should be interpreted. In discussing *Duane*, the Opinion suggests that "an extraordinary expense" rather than a usual or ordinary expense would meet the necessity standard under the first prong of *Craig*. Opinion, ¶ 20. As the Opinion notes, the parties and the District Court appear to interpret *Duane* as lowering the required showing under the first prong of *Craig*, but then asserts such is not the case as our conclusion in *Duane* "simply stated it must be shown 'the personal presence of the *witness* is impossible or impracticable[.]'" Opinion, ¶ 20 (emphasis in original). My interpretation of *Duane* is similar to that of the parties and the District Court in that "impossibility" or "impracticality" is not the same as "necessary to further an important public policy" and thus, appears to lower the required showing of necessity under the first prong of *Craig*. As noted in the Opinion in its discussion of *Jemison*—with which I agree—expense is not a justification for a constitutional shortcut. Opinion, ¶ 24. In *Duane*, there may have been considerations other than "extraordinary expense" necessitating denial of in-person, face-to-face confrontation in furtherance of an

24

important public policy, but such were not articulated and analyzed.[1]  The holding in *Duane* appears to conclude or suggest that prohibitive expense forms the basis of necessity and that *Craig*'s necessity requirement is replaced with or includes an impracticality standard. I agree with the Special Concurrence that the Opinion's efforts to not overrule *Duane* on the basis of the meager distinctions it makes are unconvincing.  To avoid further confusion over the interpretation of *Duane*, I would clarify or overrule *Duane* to eliminate its conclusion or suggestion that prohibitive expense forms the basis of necessity and to eliminate its conclusion or suggestion that *Craig*'s necessity requirement is replaced with or includes an impracticality standard.

/S/ INGRID GUSTAFSON

Justices Laurie McKinnon and James Jeremiah Shea join in the Special Concurrence and Dissent of Justice Gustafson.

/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA

---

[1] A myriad of circumstances may present such as personal circumstances of witnesses, community safety, protection of constitutional rights like that to speedy trial, or a public health crisis which could ultimately justify abrogation of in-person, face-to-face confrontation as necessary to further an important public policy.  But, expense of prosecution, while no doubt a consideration in determining if pursual of a criminal cause warrants it, cannot be a justification for a constitutional shortcut.

Chief Justice Mike McGrath, specially concurring.

¶42 While I agree with the result reached by the majority under the harmless error standard, I write separately to express my continued belief that modern two-way videoconferencing technology is a constitutionally-acceptable alternative to physical, in-person courtroom testimony, so long as the relevant indicia of reliability at the heart of the confrontation clause are present. *See Duane*, ¶¶ 29-30 (McGrath, C.J., concurring). The task of interpreting constitutional rights in light of modern technological developments remains centered on purpose and effect, as exemplified by the Fourth Amendment's continuing vitality with the advent of new surveillance technology and the First Amendment's ongoing role in protecting the free interchange of ideas transmitted through an ever-changing array of modern communication methods. Likewise, interpretation of the Sixth Amendment's right of confrontation must examine the practical effect of new technology on the interests protected by the Confrontation Clause. I believe that the majority Opinion disregards our precedent and needlessly tethers technological advancements—regardless of the constitutionally-significant distinctions among them—to a decades-old standard fashioned for the limited purpose of addressing one particular technology not at issue here.

¶43 "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Craig*, 497 U.S. at 845, 110 S. Ct. at 3163. To achieve this degree of reliability, the Confrontation Clause:

26

(1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the greatest legal engine ever invented for the discovery of truth; and (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

*Craig*, 497 U.S. at 845-46, 110 S. Ct. at 3163 (quotations and alterations omitted). These factors—formality, cross-examination, and jury observation of witness demeanor—should guide our interpretation of the Confrontation Clause through a changing technological landscape.

¶44 Though it offered a rule for a very specific situation—testimony by a child victim via one-way video—*Craig* did not claim that this rule was the final word on any and all forms of technologically-mediated testimony. Rather, *Craig* emphasized the purpose-driven nature of Confrontation Clause interpretation, noting that it:

reflects a *preference* for face-to-face confrontation at trial, a preference that must occasionally give way to considerations of public policy and the necessities of the case. We have attempted to harmonize the goal of the Clause—placing limits on the kind of evidence that may be received against a defendant—with a societal interest in accurate factfinding, which may require consideration of out-of-court statements. We have accordingly interpreted the Confrontation Clause in a manner sensitive to its purposes and sensitive to the necessities of trial and the adversary process.

*Craig*, 497 U.S. at 849, 110 S. Ct. at 3165 (citations and quotations omitted, emphasis in original). An interpretation sensitive to the purposes of the Confrontation Clause demands a more nuanced approach than that of simply repurposing the rule *Craig* fashioned for one particular technology—one-way video—to all conceivable forms of communication. There is certainly nothing inherently troubling in technologically-aided communication, as

27

evidenced by the continued uncontroversial use of eyeglasses and hearing aids to facilitate communication between individuals in a courtroom.

¶45 In fact, a fair reading of *Duane*—what I view as the controlling case on testimony via modern two-way video technology—demonstrates that this Court has already joined with those that have found *Craig's* rule for one-way video testimony inapplicable elsewhere. *See United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999); *People v. Jemison*, No. 157812, 2020 Mich. LEXIS 1076, at *14 (June 22, 2020). Contrary to the majority's reasoning, *Duane* did not cite to or purport to apply the *Craig* standard—necessity to further an important public policy in addition to adequate assurances of reliability—when addressing the issue of witness testimony via Skype. *Compare Duane*, ¶ 15 *with Craig*, 497 U.S. at 850, 110 S. Ct. at 3166. The *Duane* Court cited *Craig* merely for the uncontroversial proposition that the Confrontation Clause serves to "'"ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding'" but does not guarantee criminal defendants "'the *absolute* right to a face-to-face meeting with witnesses against them at trial.'" *Duane*, ¶ 15 (quoting *Craig*, 497 U.S. at 844-45, 110 S. Ct. at 3163) (emphasis in original).

¶46 The closest the *Duane* Court arrived to applying *Craig's* necessity requirement was when it noted that requiring a witness to travel from California "would impose a prohibitive expense on the City and a significant burden" on the witness. *Duane*, ¶ 21. The majority here attempts to repurpose *Duane* as an application of the *Craig* test by turning "prohibitive expense" into a form of "necess[ity]," as required by *Craig*. However, expense and

28

inconvenience are not sufficiently "important" government interests to satisfy the *Craig* analysis. *United States v. Carter*, 907 F.3d 1199, 1208 (9th Cir. 2018) (citing *California v. Green*, 399 U.S. 149, 189, 90 S. Ct. 1930, 1951 n.22 (1970) (Harlan, J., concurring)). The majority Opinion seemingly attempts to find an exception, unsupported by caselaw, for expenses great enough to be deemed substantially impractical or prohibitive. This rule will require trial courts to take on the role of auditor, conducting in-depth financial analysis of a government budget and making a ruling on its fiscal status.

¶47 Neither do *Duane's* facts support the majority's conclusion that *Duane* represents a *Craig* analysis and is distinguishable from the present case on the basis of heightened expense. The majority points to the fact that the three defendants initially charged in the *Duane* proceeding had elected to have separate trials, potentially tripling the travel costs of bringing the witness from California for the prosecution of each defendant. However, even assuming such tripling could conclusively establish the existence of a "prohibitive" expense, it was not material to the *Duane* holding, as the *Duane* Court explicitly noted that "[t]his appeal pertains only to Duane," not the independent proceedings against the other two defendants. *Duane*, ¶ 5. These efforts to neither follow nor overrule *Duane* on the basis of such meager distinctions are unconvincing.

¶48 I believe that the proper reading of *Duane* is one in which this Court properly declined to extend the test articulated in *Craig* for one-way video to modern two-way videoconferencing technology. The one-way technology addressed in *Craig* possesses fewer indicia of reliability than the two-way, real time communication addressed here.

29

*Duane* properly centered its analysis on the foundational principle of reliability while replacing *Craig's* "necess[ity]" requirement with an "impracticab[ility]" standard more suited to the improved technology. *See Duane*, ¶ 25.

¶49    The distinction between "necess[ity]" in *Craig* and "impracticab[ility]" in *Duane* reflects the fundamental difference between the technologies described. The one-way video technology used in *Craig* was explicitly intended to eliminate the defendant's presence in order to protect psychologically-fragile child victims from the trauma of viewing their alleged abuser while giving testimony. *See Craig*, 497 U.S. at 857, 110 S. Ct. at 3170. As a result, the *Craig* Court was compelled to fashion a necessity requirement. In contrast, here, as in *Duane*, the modern two-way video in real time provides all of the benefits of a physical face-to-face communication, as was contemplated by the "face to face" provision of Article II, Section 24, of the Montana Constitution.

¶50    Rather than purposefully obscuring a fundamental aspect of live testimony, the modern two-way telecommunications technology at issue here is intended to transmit substantially the same information as that shared by individuals physically present in the same room. As the COVID-19 pandemic has forced many of us to discover, such technology can now readily host a wide range of important interactions, including court proceedings such as the oral argument in this appeal. As technology continues to advance, it will be unsurprising if such tools eventually come to provide a virtual "face-to-face" sensory experience equally as rich as one premised on physical proximity. Mechanical application of the *Craig* standard is unhelpful in this dynamic technological context.

¶51 The *Duane* standard allows a court to effectively vindicate constitutional rights without falling into technological obsolescence. I would fully adopt *Duane's* rationale for the use of Skype two-way real-time technology to the facts of this case. The majority's holding imposes an irrational requirement for the use of this technology—especially for a foundational issue—that is unnecessary and not required by *Craig*.


/S/ MIKE McGRATH


Justice Dirk Sandefur joins the Special Concurrence of Chief Justice Mike McGrath.


/S/ DIRK M. SANDEFUR