# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00411-COA

**LEONARD STEVENSON A/K/A LEONARD STEVENSON, JR.  A/K/A LENARD STEVENSON**                     APPELLANT

**v.**

**STATE OF MISSISSIPPI**                     APPELLEE

DATE OF JUDGMENT:                02/10/2021
TRIAL JUDGE:                     HON. W. ASHLEY HINES
COURT FROM WHICH APPEALED:       WASHINGTON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:          OFFICE OF STATE PUBLIC DEFENDER
                                 BY: W.  DANIEL HINCHCLIFF
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                 BY: SCOTT STUART
DISTRICT ATTORNEY:               WILLIE DWAYNE RICHARDSON
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                     AFFIRMED - 02/14/2023
MOTION FOR REHEARING FILED:

### BEFORE BARNES, C.J., McDONALD AND LAWRENCE, JJ.

### McDONALD, J., FOR THE COURT:

¶1.    Following a jury trial in the Washington County Circuit Court, Leonard Stevenson was convicted of capital murder.  The circuit court sentenced Stevenson to serve life in prison without eligibility for parole.  Stevenson now appeals his conviction, arguing that the circuit court erred when it allowed a forensic pathologist to testify remotely in violation of the Confrontation Clause.  After a review of the record, arguments of counsel, and relevant caselaw, we affirm Stevenson's conviction and sentence.

### FACTS AND PROCEDURAL HISTORY

¶2.    On February 6, 2017, musicians Billy Smiley (Smiley) and Leonard Stevenson

(Stevenson) traveled to Greenville, Mississippi, to play in a band concert. At some point during their ride home, Stevenson and Smiley had a dispute over payment for Stevenson's services. Allegedly, while in Smiley's truck, Stevenson stabbed Smiley multiple times. Despite his injuries, Smiley managed to drive to his home, where he informed his brother and friend that Stevenson had tried to rob him. Smiley was transported to the University of Mississippi Medical Center where he died three days later.

¶3. On December 20, 2017, a Washington County grand jury indicted Stevenson of capital murder in violation of Mississippi Code Annotated section 97-3-19(2)(e) (Supp. 2015), charging him with Smiley's murder during the commission of a robbery.[1] Stevenson's case was continued several times between April 23, 2018, and January 25, 2021.

¶4. On September 10, 2019, the State filed a motion requesting that Dr. Lisa Funte, the forensic pathologist, be allowed to remotely testify live during trial through Zoom, Skype, or some other similar medium that allowed for the testimony to be presented to the jury in

---

[1] Section 97-3-19(2)(e) provides:

(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:

. . . .

(e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, robbery, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or in any attempt to commit such felonies . . . .

2

real-time.  In its motion, the State asserted that Dr. Funte had conducted Smiley's autopsy but that she was then working in Maine.  Further, the State contended that Dr. Funte's primary responsibility was with her current employer in Vienna, Maine; that Vienna is approximately 1,600 miles from Jackson, Mississippi; and that the costs associated with Dr. Funte's travel back to Mississippi for testimony were considerable.  The State argued that allowing Dr. Funte to testify remotely was similar to taking deposition testimony pursuant to Mississippi Rule of Criminal Procedure 17.5, i.e., when exceptional circumstances exist, and the interest of justice is served.

¶5.    The State further stated that allowing Dr. Funte to testify live via Zoom or Skype offered the parties the opportunity for contemporaneous objections, responses, and rulings. In support of its request, the State cited Mississippi Rule of Evidence 617, which allows a minor abuse victim's testimony to be given outside of the courtroom and shown by means of closed-circuit television in the courtroom.  The State argued that the ability to view Dr. Funte in real-time and offer "on the spot" objections, responses, and rulings was akin to the witness being physically present on the witness stand and would result in no prejudice to the defendant.

¶6.    The State also attached a memorandum from Dr. Funte to its motion.  In her memorandum, Dr. Funte stated that she had conducted Smiley's autopsy on February 13, 2017, but had been employed by the State of Maine since 2018.  She stated that there was only one major airport in Maine and that there were no direct flights from Maine to

3

Mississippi. According to Dr. Funte, it would take her two days of travel for her to attend Stevenson's trial. In addition, Dr. Funte stated that she was one of only two doctors working in her Maine office; thus, her absence placed a significant burden on others.

¶7. Dr. Funte's fee schedule was also attached to the State's motion. Pursuant to the fee schedule, the county would be charged $4,000 for Dr. Funte's time to attend the trial for two days. The county would have also been responsible for Dr. Funte's travel expenses including her flight, hotel, transportation, and meals.

¶8. Stevenson did not file a response to the State's motion and on November 22, 2019, the circuit court entered an order permitting Dr. Funte to testify remotely. In its order, the court stated that there would be real-time observation of Dr. Funte by the jury and counsel for both the State and the defendant would be given the opportunity for contemporaneous objections and responses.

¶9. On February 8, 2021, the case was tried in the Washington County Circuit Court. At trial, Smiley's brother James testified that on the day of the incident, he was lying across his bed looking out his window when he saw his brother pull up at the house. James stated that Smiley had just finished playing at a blues show. James testified that he watched Smiley open the door of his white truck and fall out. After Smiley fell out of the truck, he began calling for James. James went outside and called for Smiley's son to come outside as well. Smiley told James that Stevenson had stabbed him and tried to rob him. According to James, Smiley was covered in blood.

4

¶10.    Smiley's friend, Michael Carter testified that he was renting a room at Smiley's house when the incident occurred. After James informed him that something was going on outside, Carter exited the house to find Smiley lying on the ground with blood all over him. Carter stated that Smiley was barely moving. According to Carter, it looked like Smiley had been stabbed in his arms and face. He stated that Smiley's face was bruised. After asking Smiley several times what had happened to him, Carter stated that Smiley told him that "Leonard [Stevenson] did this." Carter said that he had seen Smiley and Stevenson together several times and that Smiley had taught Stevenson how to play the guitar.

¶11.    Investigators Danny Poe and Eric Sutton also testified at trial. Poe stated that on February 6, 2017, he was dispatched to 1292 Garden Drive, to respond to an aggravated-assault call. He stated that when he arrived at the scene, he noticed a white truck still running in the driveway. Poe testified that he looked in the vehicle and saw blood on the steering wheel, center console, and outside the vehicle. According to Poe, Smiley had been placed in the ambulance while he was still bleeding but conscious and able to talk. Smiley informed Poe that Stevenson tried to rob him and "did this to [him]." Poe testified that he observed several injuries to Smiley's face, the top of his head, and his chest area. Sixteen photos of the crime scene were marked and admitted into evidence.

¶12.    Sutton testified that when he responded to Smiley's residence, Smiley had already been transported to the hospital by ambulance. Sutton stated that through investigation, Stevenson had been identified as a suspect. Sutton stated that he and other investigators went

5

to Stevenson's sister's home to execute a search.[2] Pictures of the residence were entered into evidence showing blood stains on the sidewalk outside the residence. Sutton also stated that there were boots and other articles of clothing that appeared to have blood on them found in the room where Stevenson had been staying.

¶13. Dr. Funte testified remotely at trial.[3] After the State tendered Dr. Funte as an expert in forensic pathology, she testified that during Smiley's autopsy she noted several "sharp forced injuries" to his body. She further stated that there were at least eleven incised wounds on the body and the head and at least six stab wounds identified on the head and body. Photographs taken during the autopsy were marked and entered into evidence. Dr. Funte determined that the cause of death was "sharp forced injuries" and that the manner of death was homicide.

¶14. Stevenson cross-examined Dr. Funte regarding her autopsy report and documents that accompanied it. Dr. Funte admitted that she did not have a copy of the police report, the EMS run sheet, or the ER and hospital records when she examined Smiley. Dr. Funte stated that the documents would have provided her with a timeline of events that occurred after the injuries were received. Dr. Funte further stated that although she did not have Smiley's full case history when she conducted her examination, she did have the information that was

_____

[2] Stevenson's sister Kanesha Brown signed a consent to search form, which was marked and entered into evidence.

[3] At trial, Stevenson raised no objections to Dr. Funte's remote testimony.

6

provided by the coroner.[4]  Dr. Funte testified that despite not having Smiley's full case history, she was still able to make the determination that the stab wounds caused his death. Dr. Funte's report was entered into evidence.

¶15.    On redirect, although she had not reviewed any of Smiley's hospital records, Dr. Funte stated that she did not find any evidence indicating that Smiley's surgical wounds had contributed, impacted, or played a part in his death.

> State:          Dr. Funte, you were asked about medical intervention and Mr. Smiley being in the hospital or in medical care for three days. What evidence of medical intervention did you find at the time of the autopsy?
>
> Dr. Funte:      Again, I mentioned the chest tube that was in place as well as the sutures and staples used to close some of the injuries, and that was the primary medical intervention that was present.
>
> State:          And the evidence of medical intervention that you found and observed at the time of the autopsy in your expert opinion - -
>
> Dr. Funte:      I'm sorry.  He also had a surgical wound in the abdomen which was closed with a wound VAC.
>
> State:          And those items, when you conducted this autopsy, did you find any forensic pathological evidence that they in any way contributed, impacted or played a part in actually causing him to expire?
>
> Dr. Funte:      No.
>
> State:          And again, you were also asked about the period of time he spent in medical care from the time of injury up until he arrived

---

[4] Dr. Funte did not specify what documents the coroner provided or what information she obtained from them.

at your office. And just so we're clear, him being stabbed on February 6th, deceased on the 9th, and you observed him, the timeline, the time he spent in the hospital, the time between the stabbing and the autopsy, did that have any impact on determining what your determination as to cause and manner were?

Dr. Funte: No.

Dr. Funte again stated that the manner of death in this case was homicide, and the collective exhibit of autopsy photos were entered into evidence.

¶16. Stevenson then moved to strike Dr. Funte's testimony, arguing it was "not within a reasonable degree of pathological certainty" as to the nature of Smiley's injuries. Stevenson argued that because Dr. Funte did not get Smiley's medical records, the police report, or the ER records, her testimony was based on assumptions and not evidence. The judge overruled Stevenson's objection, stating:

> I think she made a determination on the cause and manner of death. I've never heard of a forensic pathologist refer to medical records in an autopsy report. I've never heard of that and I've heard many, many witnesses like this testify and I've never heard of them refer to anything in the medical records. They always make their judgment on examination.

The circuit court further stated that because Dr. Funte said that she had made a determination of the cause of death, it was a question for the jury.

¶17. After the State rested, Stevenson moved for a directed verdict. Stevenson argued that the State had "failed to prove a prima facie case specifically as to theft and murder or first-degree murder." Stevenson further stated that there had been no showing of the underlying crime or offense of robbery. He argued that the witnesses who spoke with Smiley that night

8

testified Smiley said that Stevenson had "tried" to rob him, not that he had in fact robbed Smiley. Thus, Stevenson argued that the State's evidence fell short on this point. The State argued that whether Stevenson had actually taken money from Smiley was a jury question. Finding the State's argument compelling, the court overruled Stevenson's motion for a directed verdict.

¶18. Stevenson was the last witness to testify at trial. He stated that he was a church musician and had been playing with Smiley in church since he was thirteen or fourteen years old. Stevenson testified that on the day of the incident, he met Smiley at a blues bar in Greenville to perform. Stevenson stated that from his understanding it was a "gig, gig, not like a fundraiser." He stated that at a fundraiser they would play to raise funds for a particular cause, but when he performed a "gig" he got paid. Therefore, Stevenson was under the impression that he would get paid for his performance that night. After the performance, while loading the band equipment in the van, Stevenson stated that he noticed the club owner give Smiley money.

¶19. Stevenson asked Smiley for a ride home, and they discussed Stevenson's payment on the way to Smiley's home. Stevenson stated that Smiley told him he was not getting paid for the show. Once they arrived at Smiley's home, Stevenson mentioned getting paid again, and an argument ensued. According to Stevenson, Smiley told him that he did have money for him, but in order for him to get it, Stevenson would have to perform sexual activities with him. Stevenson testified that Smiley specifically stated, "I will give you $300 if you let me

9

f*** you." Stevenson stated that Smiley then began groping his leg. According to Stevenson, he "snapped" and was "just fed up with [Smiley] steady bringing up the issue of sex."[5] Stevenson stated that when he pulled out his knife, he and Smiley began to "tussle." According to Stevenson, he did not attempt to rob Smiley. After the incident in Smiley's truck, Stevenson walked to his friend's home and asked his friend to drive him to Little Rock.

¶20. At the end of the trial, the jury found Stevenson guilty of capital murder, and the circuit court sentenced him to serve life in prison without parole.

¶21. On February 22, 2021, Stevenson filed a motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. In his motion, Stevenson alleged that the circuit court erred when it (1) failed to strike the pathologist's testimony, (2) did not allow into evidence Stevenson's self-authenticated mental health records from Life Help, (3) denied Stevenson's motion for a mistrial because of the State's alleged violation of his Fifth Amendment rights to cross-examination,[6] (4) denied Stevenson's motion for expert witness funds for a psychological expert of Stevenson's choice, and (5) prohibited Stevenson from presenting evidence of his only defense, which allegedly would have been supported by the

_____

[5] Stevenson testified that on two prior occasions, Smiley had made sexual advances towards him and had offered him money in exchange for sex. Stevenson stated that he had declined on those prior occasions but did not tell anyone about Smiley's advances towards him. Stevenson also stated that he had been sexually assaulted when he was seven years old by his older brother.

[6] This alleged constitutional violation was not raised on appeal.

10

psychological expert of Stevenson's choice.

¶22.    The circuit court entered an order denying Stevenson's post-trial motion on February 23, 2021.  Stevenson now appeals his conviction, raising as the sole issue whether the circuit court erred when it allowed Dr. Funte to testify remotely in violation of the Confrontation Clause.

## STANDARD OF REVIEW

¶23.    "Constitutional issues are reviewed de novo." *Buchanan v. State*, 316 So. 3d 619, 624 (¶18) (Miss. 2021).  "[I]f a confrontation clause violation is found, the violation is subject to a harmless-error analysis." *Sanders v. State*, 228 So. 3d 888, 890 (¶8) (Miss. Ct. App. 2017) (citing *Conners v. State*, 92 So. 3d 676, 684 (¶20) (Miss. 2012)).  "Where the improperly admitted evidence is largely cumulative of other evidence before the jury, and the evidence presented against the defendant, taken as a whole, is overwhelming, the error may be harmless." *Id*. at 891 (¶13).

## DISCUSSION

### I.    Procedural Waiver

¶24.    Stevenson argues that the circuit court erred in allowing Dr. Funte to testify remotely during the trial.  However, Stevenson failed to respond to the State's pre-trial motion requesting that Dr. Funte be allowed to testify remotely.  At trial Stevenson also failed to make a contemporaneous Sixth Amendment objection to the admission of Dr. Funte's remote testimony.  Moreover, Stevenson failed to raise this constitutional challenge in any of his

11

post-trial motions.[7] As a general rule, if not asserted at the trial level, constitutional questions are waived or forfeited. *Rogers v. State*, 928 So. 2d 831, 834 (¶8) (Miss. 2006) (holding that constitutional questions not raised at the lower court will not be reviewed on appeal). Because Stevenson failed to object to Dr. Funte's remote testimony, this issue was not preserved for appellate review and is procedurally barred. *Conners*, 92 So. 3d at 682 (¶15).

¶25. Notwithstanding the procedural bar, because Stevenson's challenge involves a fundamental and substantive right, we will assess whether the alleged violation constituted plain error. The Mississippi Supreme Court has held that "[u]nder the plain-error doctrine, we can recognize obvious error which was not properly raised by the defendant and which affects a defendant's fundamental, substantive right." *Id*. In *Conners*, the Mississippi Supreme Court held that a Confrontation Clause violation is a violation of a fundamental, substantive right. *Id*.; *see also Ezell v. State*, 132 So. 3d 611, 612 (¶3) (Miss. 2013) (A Confrontation Clause violation is a violation of a fundamental, substantive right.). Therefore, the supreme court has examined whether a defendant's alleged Confrontation Clause violation resulted in a manifest miscarriage of justice, despite the defendant's failure

---

[7] Although Stevenson moved to strike Dr. Funte's testimony at trial, he did not do so on the ground that her remote testimony violated his Confrontation Clause rights. In addition, Stevenson's JNOV motion failed to raise or address this constitutional challenge before the circuit court.

12

to preserve the issue for appellate review.[8]  *Id.*  Thus, notwithstanding Stevenson's procedural bar, because a Confrontation Clause violation is a fundamental, substantive right, we proceed with our examination of this issue for plain error.

¶26.  "Both the United States Constitution and the Mississippi Constitution guarantee a defendant in a criminal prosecution the right to confront the witnesses against him." *Buchanan*, 316 So. 3d at 624 (¶19).  "Upon review, if a Confrontation Clause violation is found, the violation is subject to a harmless-error analysis." *Sanders*, 228 So. 3d at 890 (¶8). Thus, even if it is determined that a violation has occurred, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Id*. at 891 (¶13).  "Where the improperly admitted evidence is largely cumulative of other evidence before the jury, and the evidence presented against the defendant, taken as a whole, is overwhelming, the error may be harmless." *Id*.

## II.    Confrontation Clause Violation

¶27.  Although Mississippi appellate courts have addressed Confrontation Clause violations

---

[8] In *Conners*, the defendant argued for the first time on appeal that the admission of two forensic reports in the absence of testimony from the analysts who performed the tests violated his Sixth Amendment right to confrontation. *Conners*, 92 So. 3d at 682 (¶13).  The Mississippi Supreme Court stated that Conners was procedurally barred from raising the issue on appeal because he failed to object to the admission of either report at trial. *Id*. at (¶15).  Despite this failure, Conners argued that the court should consider the issue under the plain-error doctrine. *Id*.  The supreme court applied the doctrine, and held that "although a Confrontation-Clause violation occurred at Conners's trial, because the error was harmless, no manifest miscarriage of justice resulted." *Id*.

when minors have testified, they have not addressed the issue of whether an adult witness's testimony via two-way live video violates the Confrontation Clause; other jurisdictions have. In making their determination, these courts have applied *Coy v. Iowa*, 487 U.S. 1012 (1988), and the *Craig* test outlined by the United States Supreme Court in *Maryland v. Craig*, 497 U.S. 836, 850 (1990), which are both child sex abuse cases. However, from these cases has emerged the principle that the State must raise a public policy necessity to support the method used to secure witness testimony.

¶28.　In *Coy*, the United States Supreme Court held that Coy's Sixth Amendment rights were violated when a screen was placed between him and two complaining child witnesses, which blocked the appellant from their sight. *Coy*, 487 U.S. at 1012. Coy was arrested and charged with sexually assaulting two thirteen-year-old girls. *Id*. at 1014. At trial, the State made a motion pursuant to an Iowa statute that allowed the "complaining witnesses to testify either via closed-circuit television or behind a screen." *Id*. The trial court granted the State's motion over the appellant's objection and Coy was convicted of two counts of engaging in lascivious acts with a child. *Id*. at 1015. Coy appealed and the Iowa Supreme Court affirmed his conviction. *Id*. On appeal, the United States Supreme Court declined to address whether *specific* exceptions to a defendant's right to confront witnesses existed. *Id*. at 1021 (emphasis added). The court did however state that exceptions would be "allowed only when necessary to further an important public policy." *Id*. Therefore, the court held that since there had been "no individualized findings that these particular witnesses needed special

14

protection, the judgment here could not be sustained by any conceivable exception." *Id*. Thus, the supreme court reversed the judgment of the Iowa Supreme Court and remanded the case for further proceedings. *Id*. at 1022.

¶29.    In *Craig*, another child sex abuse case, the United States Supreme Court held that although "the Confrontation Clause reflects a preference for face-to-face confrontation at trial," it is a preference that "must occasionally give way to considerations of public policy and the necessities of the case." *Craig*, at 497 U.S. at 849.  In that case, a Maryland statutory procedure allowed the judge to "receive, by one-way closed circuit television, the testimony of a child witness who is alleged to be a victim of child abuse." *Id*. at 840.  The supreme court assessed whether the "use of the procedure [was] necessary to further an important state interest." *Id*. at 852.  The Court concluded that "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." *Id*. at 853. Although *Craig* narrowed the findings needed for the protection of minors testifying in sex abuse cases, it reiterated *Coy*'s requirements, holding:

> As we suggested in *Coy*, our precedents confirm that a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured.

*Id*.

¶30.    Since it was decided, several courts have applied the *Craig* test when determining

whether two-way live testimony of adult witnesses is permitted. Under the first prong, the trial court must make a case-specific finding "that denial of physical face-to-face confrontation is necessary to further an important public policy." *State v. Mercier*, 479 P.3d 967, 974 (Mont. 2021). The second prong "requires the trial court to determine that reliability of the testimony is otherwise assured." *Id.*;[9] *see also United States v. Carter*, 907 F.3d 1199, 1208 (9th Cir. 2018).

¶31.   In *Mercier*, 479 P.3d at 976, the Montana Supreme Court considered whether the trial court erred in finding that an agent's testimony via two-way video was necessary to further an important public policy under the first prong of the *Craig* test. *Id*. Mercier was convicted of two crimes: deliberate homicide of his ex-girlfriend, Sheena Devine, and tampering with physical evidence, i.e., Sheena's cell phone. *Id*. at 972. On October 5, 2016, Mercier went

[9] Courts have noted that the reliability prong of the *Craig* test has been called into question by a later United States Supreme Court case, *Crawford v. Washington*, 541 U.S. 36 (2004). *Crawford* involved the admission of hearsay testimony allegedly in violation of the Confrontation Clause. Justice Scalia, writing for the majority, stated that "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of reliability." *Id*. at 61. The court further stated that "[a]dmitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation." *Id*. While *Crawford* did not explicitly overrule *Craig*, some courts have argued that at least it may have overruled the reliability prong. *See Haggard v. State*, 612 S.W.3d 318, 326 (Tex. Crim. App. 2020) (stating *Crawford* implicitly overruled *Craig*, or at least the reliability prong); *State v. Smith*, 636 S.W.3d 576, 584-85 (Mo. 2022) (stating *Crawford* transformed the Supreme Court's approach to the Confrontation Clause from a case-by-case reliability-balancing test to a categorical rule). Despite *Crawford*'s holding, *Craig*'s test is still used by courts to determine whether a constitutional violation has occurred when two-way live testimony is permitted and a party challenges the necessity of the remote testimony.

to Sheena's home and began pelting her vehicle with rocks. *Id*. at 971. Sheena's neighbors called 911, but Mercier fled prior to an officer's arrival. *Id*. Later that evening, Mercier "returned to Sheena's residence and again threw rocks at her vehicle." *Id*. "Instead of contacting police, Sheena went outside and confronted Mercier." *Id*. According to Mercier, Sheena attacked him, and he placed her "in a sleeper hold to thwart her attack, resulting in Sheena losing consciousness." *Id*. Mercier stated that he then carried Sheena into her home and left within five to ten minutes. *Id*. According to Mercier, "Sheena was breathing and snoring when he left." *Id*.

¶32.   The next morning, Sheena's friend called 911, requesting medical assistance for a possible assault. *Id*. "An emergency medical technician arrived first and determined that Sheena had died." *Id*. At the scene, police "discovered Sheena's cell phone submerged in a pot of greasy water in the kitchen sink." *Id*. Sheena's phone remained operational despite being submerged the water. *Id*. "However, local technicians struggled to retrieve information from the device," and it was sent to Agent Brent in Colorado, who specialized in extracting data from electronics. *Id*.

¶33.   Prior to trial, the State requested that Agent Brent be allowed to testify from Colorado by live two-way video. *Id*. "As grounds, the State offered that the $670 for round-trip air travel and other travel expenses for purely foundational testimony was impractical." *Id*. Over Mercier's objection, the district court permitted Agent Brent to testify via two-way videoconferencing at trial. *Id*. Agent Brent testified about the methods and equipment used

17

to retrieve data from the cell phone, and "the phone's contents, particularly, two time-stamped photographs retrieved from the phone." *Id*. The photographs were the only evidence showing that Mercier was in Sheena's home and had handled Sheena's phone at the time the photos were taken, directly contradicting the time Mercier said he left the home. *Id*.

¶34. The Montana Supreme Court stated that "[c]ourts are essentially uniform in requiring, under the first prong [of *Craig*'s test], something more than generalized findings of policy concerns." *Id*. at 974. The trial court held that "the significant time and expense required for [Agent Brent] to testify in-person outweighed any perceived diminution of Mercier's confrontation right . . . ." *Id*. at 976. However, the supreme court stated that the "case-specific findings demonstrating the necessity of [Agent Brent's] testimony [was] not entered here." *Id*. The court stated that based on the record, the remote testimony was "permitted for the stake of generalized judicial economy," and "[a]lthough judicial economy may be an important public policy in other contexts, standing alone, it must yield to the constitutional rights of the accused." *Id*. Thus, the supreme court held that Agent Brent's "testimony was improperly admitted," and "[i]ts necessary exclusion means there was no foundation for admission of the two . . . photographs extracted from Sheena's cell phone, which must be excluded as well." *Id*. at 977.

¶35. Next, the Montana Supreme Court assessed whether the court's error (admitting Agent Brent's remote testimony) was harmless. In making its determination, the supreme court stated that it was required to "consider the importance of the witness' testimony in the

18

prosecution's case, whether the testimony was cumulative, and the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points." *Id*. Accordingly, the supreme court stated that harm is assessed by "whether the fact-finder was presented with admissible evidence that proved *the same facts as the tainted evidence proved*." *Id*. Concerning the charge of deliberate homicide, the court held that the Confrontation Clause violation was harmless because the State presented an eyewitness who observed Mercier inside Sheena's home around midnight—the same time the photographs retrieved from the cell phone were taken in the house and time-stamped. *Id*. at 978.

¶36.    However, concerning the charge of tampering with physical evidence, the court held that the error was not harmless because the photographs were the only evidence supporting the State's allegation that Mercier used Sheena's cell phone. Therefore, the court held that the evidence in this sense was tainted by the Confrontation Clause violation and set aside Mercier's conviction for tampering with physical evidence. *Id*. at 978.

¶37.    We note that the Montana Supreme Court has also held that under certain circumstances, permitting remote witness testimony will not violate a defendant's confrontation rights. In *City of Missoula v. Duane*, 355 P.3d 729, 734 (Mont. 2015), the Montana Supreme Court held that the municipal court did not err when it allowed a veterinarian, who conducted a necropsy on a dog, to testify remotely in four misdemeanor cases. *Id*. In that case, the defendant and two others owned dogs and were charged with animal cruelty. Each defendant requested a separate trial and the cases were severed. *Id*.

19

Prior to Duane's trial, the City filed a motion requesting that the veterinarian, who had performed the necropsies on the animals, be allowed to testify by two-way video because she had moved her practice to California. *Id*. "The city asserted that requiring [the doctor] to travel to and testify in person at three separate trials would impose a significant burden on [the doctor]." *Id*. Over Duane's objection, the municipal court granted the City's motion, stating that the veterinarian's "Skype testimony would suffice and would not violate Duane's constitutional right to confrontation." *Id*. At the end of his trial, the jury found Duane guilty and upon notice of his intention to appeal, the municipal court stayed his sentence. *Id*. On appeal, the Montana Supreme Court held that the municipal court did not err in allowing the veterinarian to testify remotely. *Id*. at 733. The supreme court stated that the City had made a "compelling showing that requiring [the veterinarian] to travel to Missoula from California to testify live at three separate trials would impose a prohibitive expense on the City and a significant burden on [the veterinarian]." *Id*. In summary, the remote testimony in this case did not constitute a violation of the defendant's confrontation rights because the court held that it was impractical to require the veterinarian to travel to Montana for three separate trials on misdemeanor charges.

¶38.    More recently, in *State v. Smith*, 636 S.W.3d 576 (Mo. 2022), the Missouri Supreme Court reversed a defendant's conviction holding that the admission of an expert's testimony via two-way live video violated the defendant's confrontation rights. *Id*. at 587. In that case, I.S., who was sixteen years old at the time, alleged that she had been sexually assaulted by

20

Smith. *Id*. at 578. I.S. was taken to the "hospital, where an emergency-room physician took swabs from I.S.'s body for a sexual assault kit." *Id*. Hall "collected a buccal swab from Smith, and completed a DNA analysis and laboratory report." *Id*. "Hall's work showed the unknown male DNA from I.S.'s sexual assault kit matched the DNA from Smith." *Id*. The DNA Section Supervisor, Kwiatkowski, reviewed and approved Hall's report. *Id*. The defendant was charged with two counts of statutory rape in the second degree. At trial, the State called Kwiatkowski to testify about I.S.'s DNA samples and the "DNA on such samples matching unknown male DNA." *Id*. The State did not initially call Hall to testify because he was on paternity leave. *Id*. "The State sought to present evidence of Smith's buccal swabs through Kwiatkowski, but Smith objected." *Id*. After a discussion between the parties, the State requested that the circuit court allow Hall to testify remotely. *Id*. The circuit court granted its request over Smith's objection. *Id*. Smith was convicted of two counts of statutory rape. *Id*.

¶39.    Smith appealed and after a thorough examination of *Coy*, *Craig*, and *Crawford*, the Missouri Supreme Court held that the circuit court had failed to make a finding that the expert was unavailable, therefore allowing the expert to testify remotely violated the defendant's confrontation rights. *Id*. at 587. The supreme court also held that the error was not harmless beyond a reasonable doubt because the evidence from Hall was the only physical evidence proving sexual contact between the defendant and the victim. *Id*. The supreme court reversed the circuit court's judgment and remanded the case.

21

¶40.    In the present case, our analysis focuses on the first prong of *Craig*'s test, whether allowing Dr. Funte to testify remotely furthered an important public policy.   Stevenson argues no exceptional circumstances were shown, and no important public policy justified allowing Dr. Funte to testify remotely.   Stevenson further argues that he was denied a constitutional right where no exception to the right had been specified by rule and recognized as a compelling state interest.

¶41.    By attaching Dr. Funte's memorandum to its motion, the State attempted to make a public fiscal policy argument to satisfy the first prong of the *Craig* test.  In her memorandum, Dr. Funte stated that she would make every reasonable effort to appear in court to testify, but it would take two days of travel for her to attend Stevenson's trial, that it would inconvenience the other doctor in her Maine office, and her time would cost the state $4,000.

¶42.    But in its order granting the request to use live video testimony the circuit court did not address the State's public-policy-necessity argument but, instead, only addressed the reliability prong of *Craig*'s test stating:

> [T]here will remain (1) real-time observation of the witness by the jury and counsel for both the State and the defendant, (2) the opportunity for contemporaneous objections and responses, and (3) the facilitation of immediate rulings from the court on any objections and other issues by the allowance of the said electronic testimony by way of live video.

Thus, as in *Mercier*, the circuit court here failed to make a "case-specific" threshold finding of necessity for remote video testimony under the first prong of the *Craig* test.  In *Corbin v. State*, 74 So. 3d 333, 340 (¶21) (Miss. 2011), a case dealing with the admission of hearsay,

22

the Mississippi Supreme Court held that "[w]hen dealing with testimonial evidence, a finding of reliability [alone] does not create an exception to the Confrontation Clause." *Id*. The supreme court further stated that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually proscribes: confrontation." *Id*. Here, Dr. Funte stated that she would make every reasonable effort to appear in trial if required to do so. Therefore, she was available and the State presented no evidence to the contrary. As the Montana Supreme Court held in *Mercier*, "[a]lthough judicial economy may be an important public policy in other contexts, standing alone, it must yield to the constitutional rights of the accused." *Mercier*, 479 P.3d at 976; *see also United States v. Carter*, 907 F.3d 1199, 1208 (9th Cir. 2018) (stating constitutional rights cannot be neglected merely to avoid added expense or inconvenience); *People v. Jemison*, 952 N.W.2d 394, 400 (Mich. 2020) (explaining expense is not a justification for a constitutional shortcut). Despite the evidence of cost presented by the State, the circuit court made no finding of necessity on that or any other basis. Therefore, we find that the circuit court erred by permitting Dr. Funte to testify remotely in violation of Stevenson's Sixth Amendment confrontation right.

¶43. However, our holding on this matter is limited. We are not holding that remote testimony violates the Confrontation Clause per se. Instead, we hold that such testimony may be allowed if the trial court makes the requisite finding of necessity as well as reliability. In this case, the reliability prong of the *Craig* test was clearly satisfied because Stevenson had

the opportunity to extensively cross-examine Dr. Funte, make contemporaneous objections, and receive rulings in real-time; further no technical difficulties were noted in the record.[10] But, despite the fact that the reliability prong was satisfied, the circuit court failed to make the required finding of necessity, thus Stevenson's rights were violated. This error, however, was harmless as we will further discuss below. Thus, to reiterate, when a court makes the requisite findings of both necessity *and* reliability, such remote testimony is permitted.

### III. Harmless Error Analysis

¶44. Finding that Stevenson's confrontation rights were violated, we must now determine whether Stevenson was harmed by such a violation. As previously stated, "[w]here the improperly admitted evidence is largely cumulative of other evidence before the jury, and the evidence presented against the defendant, taken as a whole, is overwhelming, the error may be harmless." *Sanders v. State*, 228 So. 3d 888, 891 (¶13) (Miss. Ct. App. 2017). "Errors are not harmless if they resulted in a manifest miscarriage of justice against the defendant." *Id*. Relevant factors in determining whether an error is harmless or prejudicial include "whether the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged." *Jones v. State*, 287 So. 3d 995, 1011 (¶55) (Miss. Ct. App. 2019). "Whether a violation of the confrontation clause in a particular case may be classified as harmless error depends upon a number of factors." *Raiford v. State*, 907 So. 2d 998, 1004

---

[10] We also note that Stevenson did not file a response to the State's request to allow Dr. Funte's remote testimony, he did not raise a confrontation objection at trial, and he did not raise this issue in his JNOV/new trial motion.

(¶15) (Miss. Ct. App. 2005) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

> These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Corbin*, 74 So. 3d at 338-39 (¶16). In *Corbin*, the defendant was convicted of murder, aggravated assault, and fleeing the scene of a car accident (a felony). *Id*. at 337 (¶8). Corbin appealed his convictions arguing, among other things, that the trial court violated his Sixth Amendment right to confrontation when it allowed the State to play a recorded statement from the victim, who died before trial. *Id*. at (¶9). The Mississippi Supreme Court held that because the victim's statement was testimonial, its admission violated Corbin's confrontation rights and should have been excluded. *Id*. at 338 (¶14). The supreme court considered the factors noted above and found that the trial court's error was not harmless as to the convictions of murder and aggravated assault because the statement was the only piece of evidence showing that Corbin had purposely or knowingly caused the victim's car wreck. *Id*. at 339 (¶17). But the supreme court found that the error was harmless as to the conviction of felony fleeing because "overwhelming evidence of Corbin's guilt was properly submitted to the jury." *Id*. at 340 (¶22).

¶45.    This Court has also found a constitutional violation not to be harmless in *Jones*, where the defendant appealed his convictions arguing that "he was denied a fair trial when the [circuit] court allowed the State to present evidence of another separate crime for which he

had not been tried or convicted." *Jones*, 287 So. 3d at 999 (¶1). In that case, a detective named Jaime White testified, among other things, about "evidence obtained through the investigation of the later robbery that bore some similarities to [the victims in the current case]." *Id*. at 1002 (¶18). The victims of the other robbery did not testify. At the end of trial, the jury found Jones guilty of all charges, and he appealed. *Id*. at 1004 (¶28).

¶46. On appeal, this Court stated that White's testimony amounted to testimonial hearsay. *Id*. at 1007 (¶42). Thus, we held that "Jones's right to confront the witnesses (i.e. the other robbery victims) against him was violated when the State presented impermissible testimonial hearsay about key elements of the later robbery through White, instead of calling the actual victims as witnesses." *Id*. at 1009 (¶49). We further held that "the court's error in admitting White's testimonial hearsay and the physical evidence of the latter robbery [was] not harmless" but instead constituted prejudicial error because Jones was deprived of his right to cross-examine the witnesses of the other robbery. *Id*. at 1012 (¶57).

¶47. In contrast to *Corbin* and *Jones*, in *Sanders* we held that the defendant was not harmed by the Confrontation Clause violation that occurred during his trial. *Sanders*, 228 So. 3d at 893 (¶19). In *Sanders*, during a police operation, a confidential informant, White, informed Agent Brown that Sanders had sold him drugs. *Id*. at 889 (¶3). Because White was killed before Sanders's trial, his video "statement identifying Sanders was played at trial and in the presence of the jury." *Id*. at (¶12). This Court held that because "White's statement was testimonial, and Sanders never had the opportunity to cross-examine White, the circuit court

26

erred when it admitted White's statement in violation of the Confrontation Clause of the Sixth Amendment." *Id*. Sanders argued that he suffered harm and was substantially prejudiced by the admission of White's statement at trial. *Id*. at (¶14). However, in addition to White's video statement identifying Sanders, the circuit court also "admitted still photographs submitted by the State of screen-shots from the video," which clearly showed Sander's face from multiple angles. *Id*. An investigator also identified Sanders from still photos that were shown. *Id*. at (¶15). Therefore, because there was additional evidence outside the tainted evidence that stemmed from the Confrontation Clause violation, we held that "the circuit court's error . . . was a harmless one, and as such, no manifest miscarriage of justice occurred . . . ." *Id*. at 892 (¶16).

¶48. Here, however, as in *Sanders*, there was other evidence presented in addition to Dr. Funte's testimony and report from which a jury could conclude that Stevenson's actions caused Smiley's death.[11] James, Carter, and Poe testified that they observed Smiley covered in blood with injuries to his face, head, and chest. These three witnesses all testified that Smiley made dying declarations that Stevenson had caused his injuries; for example, Smiley stated that "Leonard [Stevenson] did this." In addition, at trial Stevenson admitted that he

---

[11] In the present case, Dr. Funte's testimony and autopsy report were admitted to establish Smiley's manner and cause of death, which was an essential element required to satisfy section 97-3-19(2)(e). However, without Dr. Funte's testimony, there was no foundation to admit her autopsy report. Thus, because we find that Dr. Funte's testimony was admitted in violation of Stevenson's confrontation rights, the autopsy report constituted tainted evidence that must also be excluded.

27

snapped, pulled out his knife, and "tussled" with Smiley.

¶49. Although Smiley did not succumb to his injuries until three days later, there was no medical evidence of any intervening cause of death, and the jury could conclude that the injuries Smiley sustained from Stevenson's attack caused his death. In *Watts v. State*, 210 Miss. 236, 49 So. 2d 240, 241 (1950), a defendant was convicted of manslaughter and appealed. In that case, it was alleged that the defendant had shot the victim after leaving a night club. *Id*. The victim lived forty-eight days after the injury. *Id*. There were three eyewitnesses to the shooting who testified that the defendant was the shooter. *Id*. On appeal, the defendant argued that the State had failed to prove that the gunshot resulted in the victim's death. *Id*. At the trial, "no medical evidence was offered by the State" to establish the victim's cause of death. *Id*. However, the Mississippi Supreme Court stated:

> While good trial practice recognizes the virtue of producing expert evidence as to the cause of death, where a considerable period of time elapses between the injury and the death, we think that the circumstances in this case were sufficient to prove beyond reasonable doubt that [the victim] met his death by reason of a wound inflicted by [the defendant]. At least, the evidence was sufficient to justify the jury in so finding.

*Id*. Thus, the defendant's conviction was affirmed. *Id*. at 242.

¶50. This rationale was reiterated in *Houston v. State*, 220 Miss. 166, 70 So. 2d 338 (1954). In that case, a defendant was convicted of manslaughter after stabbing the victim in the abdomen with a "long crab apple switch knife." *Id*. at 398. Immediately after the stabbing, the victim was taken to the hospital, where he died seventeen days later of uremia poisoning. *Id*. On appeal, the defendant argued that the State failed to "prove causal

28

connection between the stab wound and the death of [the victim] . . . ." *Id*. at 339. The supreme court held, however, that "[e]ven though the immediate cause of death was uremic poisoning, the jury was fully justified in believing beyond a reasonable doubt that the stab wound was a substantial contributing cause of death." *Id*. at 340. Therefore, the court affirmed the defendant's conviction.

¶51. Likewise, in this case, even though Smiley died three days after he was stabbed, we find that based on the evidence presented, the jury was justified in finding beyond a reasonable doubt that the stab wounds caused Smiley's death, even without Dr. Funte's testimony. Although allowing Dr. Funte to testify as the court did violated the Confrontation Clause, there was no prejudicial error because the jury was presented with sufficient evidence to find beyond a reasonable doubt that Stevenson had committed the crime.

## CONCLUSION

¶52. Therefore, despite the procedural bar, we find that the circuit court violated Stevenson's constitutional right to confrontation by allowing Dr. Funte to testify remotely because there was no case-specific determination of necessity made. However, because there was other sufficient evidence to support the jury's inference that the stab wounds resulted in Smiley's death, the error was harmless. Therefore, we affirm Stevenson's conviction and sentence.

¶53. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE AND McCARTY, JJ., CONCUR. WILSON, P.J., LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR IN PART**

29

**AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**